CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CHRISTY O'CONNOR (Bar No. 250350)
(E-Mail: Christy_O'Connor@fd.org)
RAMANUJAN NADADUR (Bar No. 315718)
(E-Mail: Anuj_Nadadur@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
CATALINO VALIENTE ALONZO

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00059-DMG |
| Plaintiff, | |
| v. | **CATALINO VALIENTE ALONZO'S NOTICE OF MOTION AND MOTION FOR A NEW TRIAL UNDER FED. R. CRIM. PROC. 33** |
| CATALINO VALIENTE ALONZO, | |
| Defendant. | **Hearing Date: 5/31/2023 at 2:00 PM** |

Catalino Valiente Alonzo ("Mr. Valiente"), by and through his counsel of record, Deputy Federal Public Defenders Christy O'Connor and Ramanujan Nadadur, hereby moves this Court for a new trial under Federal Rule of Criminal Procedure 33. This motion is based on the attached memorandum of law, the attached exhibits, and all of the files and records in this case.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: April 28, 2023     By  /s/ Christy O'Connor
                          CHRISTY O'CONNOR
                          RAMANUJAN NADADUR
                          Deputy Federal Public Defenders
                          Attorneys for CATALINO VALIENTE
                          ALONZO

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ......................................................................................... 1

II. STATEMENT OF FACTS ......................................................................... 1

    A.   What the Government's Own Documents Show. ......................... 2

         1.   1990: There Was No Pending Case in Guatemala ........................ 2

         2.   Green Card Application: There is No Evidence Mr. Valiente Had Knowledge of a Pending Case in Guatemala .......................... 2

         3.   2014: Guatemala Knew Mr. Valiente's Whereabouts and the United States Knew about his Case. .................................................. 3

         4.   2015: A Guatemalan Court of Appeals Acquits Mr. Valiente and Recalls the Arrest Warrant........................................................ 4

    B.   The Government's Pretrial Actions Set the Stage for Its Misconduct at Trial. ............................................................................. 4

         1.   2018: Press Release A 2018 USAO Press Release States that the Warrant Was Rescinded and Charges May Not Be Pending. ........... 5

         2.   Discovery Produced: Voluminous, Untranslated Legal Documents. .................................................................................. 6

         3.   The Absence of 404(b) Notice. ............................................... 7

    C.   Misconduct at Trial ..................................................................... 7

         1.   The Government Called Mr. Valiente a Fugitive from Justice Without a Good Faith Basis............................................................. 7

         2.   The Government Elicited False Evidence that Mr. Valiente was a Wanted Man at the Time of Trial. ................................................ 10

         3.   The Government Argues that Mr. Valiente Actually Committed Double Kidnapping and Murder....................................................... 13

         4.   The Government Linked Mr. Valiente to the Internationally-Recognized Human Rights Abuses of an Autocratic Regime......... 14

             a.   The Gratuitous Nazi Reference. ........................................... 14

             b.   Human Rights, "Transitional Justice," and Mr. Valiente's Position of Power in an Autocracy........................................ 16

         5.   Improper Comments on Mr. Valiente's Exercise of Constitutionally-Guaranteed Rights and Mr. Valiente's Behavior at Trial.............................................................................................. 18

III. ARGUMENT............................................................................................ 20

         1.   The *Napue* Violation, Standing Alone, Requires a New Trial........20

# TABLE OF CONTENTS

**PAGE**

a. The Government Elicited False Evidence. ............................ 20

b. The Prosecution Team Knew and Should Have Known the Evidence was False ........................................................... 21

c. *Napue*'s Low Materiality Threshold is Satisfied ................. 23

2. The Cumulative Effect of the Government's Misconduct Warrants a New Trial ........................................................... 25

a. Unnoticed 404(b) ............................................................... 25

b. Maligning the defense and defendant ................................. 27

IV. CONCLUSION ....................................................................................... 30

# TABLE OF AUTHORITIES

**PAGE(S)**

**Federal Cases**

*Bates v. Bell,*
   402 F.3d 635 (6th Cir. 2005) ........................................................................28

*Berger v. United States,*
   295 U.S. 78 (1935) .......................................................................................27

*Boyd v. French,*
   147 F.3d 319 (4th Cir. 1998) .......................................................................21

*Brady v. Maryland,*
   373 U.S. 83 (1963) .......................................................................................24

*Cline v. United States,*
   395 F.2d 138, 141 (8th Cir. 1968) ...............................................................27

*Darden v. Wainwright,*
   477 U.S. 168 (1986) ...............................................................................25, 29

*Donnelly v. DeChristoforo,*
   416 U.S. 637 (1974) .....................................................................................29

*Dow v. Virga,*
   729 F.3d 1041 (9th Cir. 2013) ...............................................................24, 25

*Hayes v. Brown*
   399 F.3d 972 (9th Cir. 2005) (en banc) ......................................................25

*Jackson v. Brown,*
   513 F.3d 1057 (9th Cir. 2008) ...........................................................*passim*

*Napue v. Illinois,*
   360 U.S. 264 (1959) ..........................................................................1, 20, 22

*Sivak v. Hardison,*
   658 F.3d 898 (9th Cir. 2011) .......................................................................25

*United States v. Butler,*
   567 F.2d 885 (9th Cir. 1978) ...................................................20, 22, 24, 25

*United States v. Carroll,*
   678 F.2d 1208 (4th Cir. 1982) .....................................................................29

iii

# TABLE OF AUTHORITIES

**PAGE(S)**

*United States v. Friedman*,
    909 F.2d 705 (2d Cir. 1990) ........................................................................28

*United States v. Gale*,
    314 F.3d 1 (D.C. Cir. 2003) ........................................................................24

*United States v. Gatto*,
    995 F.3d 449 (3d Cir. 1993) ........................................................................29

*United States v. Holmes*,
    413 F.3d 770 (8th Cir. 2005) ...............................................................27, 28

*United States v. Hsia*,
    24 F. Supp. 2d 14 (D.D.C. 1998) ...............................................................24

*United States v. Jones*,
    839 F.2d 1041 (5th Cir. 1998) ....................................................................28

*United States v. McLain*,
    823 F.2d 1457 (11th Cir. 1987) ..................................................................29

*United States v. Murrah*,
    888 F.2d 24 (5th Cir. 1989) ........................................................................28

*United States v. Pearson*,
    746 F.2d 787, 796 (11th Cir. 1984) .......................................................29-30

*United States v. Richardson*,
    161 F.3d 728 (D.C. Cir. 1998) ...................................................................28

*United States v. Rodrigues*,
    1998 U.S. App. LEXIS 36919 (9th Cir. 1999) ..........................................28

*United States v. Rodriguez-Lopez*,
    756 F.3d 422 (5th Cir. 2014) ......................................................................28

*United States v. Schuler*,
    813 F.2d 978 (9th Cir. 1987) ......................................................................29

*United States v. Skilling*,
    554 F.3d 529 (5th Cir. 2009) ......................................................................24

iv

# TABLE OF AUTHORITIES

**PAGE(S)**

*United States v. Thomas*,
  981 F. Supp. 2d 229 (S.D.N.Y 2013) .................................................... 24

*United States v. Vega*,
  188 F.3d 1150 (9th Cir. 1999) ............................................................... 26

*United States v. Young*,
  470 U.S. 1, 18-19 (1985) ....................................................................... 27

**Other Authorities**

Fed. R. Crim. Proc. 33(a) ............................................................... 1, 20

Fed. R. Evid. 404(b) ............................................................................. 26

Federal Rule of Criminal Procedure 33 ............................................... 20

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The government put Mr. Valiente's character on trial. It repeatedly called him a fugitive without a good faith basis to do so, arguing that this was his motive for committing the charged crime. It elicited false testimony that he was wanted in Guatemala and evading extradition. It accused Mr. Valiente of murdering and kidnapping as part of an autocratic regime's internationally recognized human rights abuses. It accused defense counsel, and Mr. Valiente in collusion with defense counsel, of putting on a "show" to deceive the jury: "smoke and mirrors." Together, the government's misdeeds painted a picture of a defendant who stood before the jury a guilty fugitive from justice, gaming the legal processes of two countries, using tactics of evasion and deception to avoid facing justice both for heinous human rights abuses abroad, and for false statements in a green card application here.

This Court should grant Mr. Valiente a new trial. *See* Fed. R. Crim. Proc. 33(a) (empowering a trial court to vacate a judgment and grant a new trial "if the interest of justice so requires"). When the government knowingly elicits false testimony at trial, as it did here, that alone means that "reversal is virtually automatic." *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (internal citations omitted); *Napue v. Illinois*, 360 U.S. 264 (1959). The government's conduct, however, went beyond *Napue* violations, infecting virtually every stage of this trial and cumulatively, striking at the heart of Mr. Valiente's character and his ability to present a defense. Because Mr. Valiente deserves fairness, a new trial is the only remedy.

## II.  STATEMENT OF FACTS

Government misconduct pervaded this trial. First, the government repeatedly represented, with no good faith basis in fact, that both when he entered the country and when he applied for his green card, Mr. Valiente was a knowing fugitive from a 30-year sentence in Guatemala. His knowledge of a pending case and inevitable sentence there, it argued without basis, was his motive to lie on his green card application.

1

Second, it elicited false testimony from its expert witness that at the time of trial, Guatemala was still pursuing his arrest and prosecution, and would have extradited him but for his own elusiveness. Third, it went beyond alleging that he lied about an arrest, charge, and imprisonment; it alleged that he actually committed the crimes of double kidnapping and murder, and that he did so in furtherance of the internationally-condemned human rights abuses of an autocratic regime in which he held a position of great authority. Finally, the government improperly commented on Mr. Valiente's exercise of his constitutional rights, accusing defense counsel, alone and in collusion with Mr. Valiente, of deceiving the jury by presenting a defense.

## A.     What the Government's Own Documents Show.

### 1.     1990: There Was No Pending Case in Guatemala.

It is undisputed that when Mr. Valiente entered the United States in 1990, he had no pending prosecution in Guatemala. His convictions had been overturned by a Guatemalan Court of Appeals, and he had been released from prison.[1] With no case against him, it would be factually impossible for him to be a fugitive from justice when he entered the United States in 1990.

### 2.     Green Card Application: There is No Evidence Mr. Valiente Had Knowledge of a Pending Case in Guatemala.

In 1993, three years after Mr. Valiente had entered the United States, the Guatemalan Supreme Court overturned the Court of Appeals' decision vacating the convictions and remanded the case for further proceedings. There is absolutely no evidence, however, that Mr. Valiente ever learned of that 1993 decision, that his case was ever revived, or that there was, at any point after he was freed in 1990, a warrant out for his arrest. There is no evidence that the 1993 decision was widely publicized or

---

[1] Even Dr. Aizenstadt conceded as much. On cross examination, he acknowledged that in the period of time in between 1990 and 1993, there was no active arrest warrant, Mr. Valiente was a "free man," and that he could travel freely. Exhibit A (Partial Trial Transcript), p. 59.

2

even made the news in the Los Angeles area. In fact, as detailed below, there is evidence that at least at one point, both countries took steps to avoid informing him that the case was active. *See* Exhibit C (discussed below). The government therefore has no good faith basis to believe that Mr. Valiente, at time he applied for his green card, knew that the case against him had been revived or that there was a warrant for his arrest.

### 3.   2014: Guatemala Knew Mr. Valiente's Whereabouts and the United States Knew about his Case.

Among the thousands of pages of untranslated Spanish-language documents produced in discovery is an April 10, 2014 letter from the Head of Interpol Guatemala to a Guatemalan Court of Appeals. Exhibit B.[2] The letter makes two things clear: first, that Mr. Valiente's location was easily ascertainable by Interpol Guatemala. The letter reads:

> I respectfully write you with the purpose of informing you that the Police Department of Los Angeles, California (INTERPOL'S Fugitives Unit) has informed this Division that, in Los Angeles, California, they have a valid location for the Guatemalan citizen CATALINO ESTEBAN VALIENTE ALONZO.

Ex. C.

Second, the letter makes it clear that while the charges against him were pending in Guatemala, both governments took steps to prevent him from being made aware of them. Guatemalan authorities, along with the Los Angeles Police Department's Interpol Fugitives Unit, made the conscious decision to avoid disclosing the warrant's existence to Mr. Valiente:

---

[2] An English translation of the letter was provided to the defense on March 24, 2023. Ex. C. *See also* Exhibit D (March 24, 2023 correspondence) (discussed below).

In that sense, the detective in charge REQUESTS that a summary of the acts attributed to Mr. Valiente Alonzo be provided to [the detective], so that said summary can be submitted upon his arrest and may prevent Immigration Authorities from giving him any precautionary measures, thus allowing the deportation to Guatemala to proceed.

*Id.* In other words, the governments did not put Mr. Valiente on notice that he was wanted in Guatemala.

### 4.    2015: A Guatemalan Court of Appeals Acquits Mr. Valiente and Recalls the Arrest Warrant.

Also among that untranslated, Spanish-language discovery is a 2015 Guatemalan appellate court opinion acquitting Mr. Valiente of all charges against him. Exhibit E.[3] After explaining that Mr. Valiente's convictions had rested on improprieties, including that the burden had been shifted onto Mr. Valiente to prove his own innocence and that the trial court had improperly applied a judicial presumption of guilt, the opinion concludes:

. . . it resolves, pursuant to law, DUE TO LACK OF CONCLUSIVE EVIDENCE, TO ACQUIT . . . CATALINIO ESTEBAN VALIENTE ALONZO . . . of the acts subject to this proceeding, and, due to the nature of the ruling, the duly issued arrest warrants are rendered ineffective . . ."

Ex. F at 7529.

### B.    The Government's Pretrial Actions Set the Stage for Its Misconduct at Trial.

The government's actions before trial set the stage for its misconduct at trial. In 2018, it issued a press release confirming its familiarity with the contents of the untranslated, Spanish-language documents in its possession. *See* Exs. B, E. In other

_____

[3] An English translation of the opinion was provided to the defense on March 24, 2023. Exhibit F. *See also* Exhibit D (March 24, 2023 correspondence) (discussed below).

4

words, members of the prosecution team knew that Mr. Valiente's conviction in Guatemala was no longer firm. And the trial prosecutor's pretrial statements, and lack thereof, to the Court and to the defense belied its trial strategy of painting Mr. Valiente to be a fugitive and a murderer.

### 1. 2018: Press Release A 2018 USAO Press Release States that the Warrant Was Rescinded and Charges May Not Be Pending.

On February 9, 2018, the day of Mr. Valiente's initial appearance in this case, the United States Attorney's Office issued a press release entitled "Former Top Official with Guatemalan National Police Arrested on Visa Fraud Charge for Allegedly Failing to Disclose Murder Charges." Exhibit G.[4] In it, the government explained:

> In late 1987, Valiente and others were charged in Guatemala with the kidnapping and murder of two people affiliated with the Agronomy Department at the Centro Universitario de Occidente in Quetzaltenango. Valiente was convicted twice, but both convictions-- and two 30-year sentences-- were overturned on appeals, and the matter was remanded to a trial court for further proceedings in 1993. *An arrest warrant for Valiente was issued in July 1993, and it renewed twice, but the warrant was rescinded in 2015. It is unclear if charges remain pending against Valiente in Guatemala.*

*Id.* (emphasis added).

---

[4] *Available at* https://www.justice.gov/usao-cdca/pr/former-top-official-guatemalan-national-police-arrested-visa-fraud-charge-allegedly (last accessed April 22, 2023).

### 2. Discovery Produced: Voluminous, Untranslated Legal Documents.

The government produced in discovery almost 10,000 pages[5] of Spanish-language legal documents, including the 2014 Interpol letter and 2015 judgment of acquittal mentioned above, Exs. B, E. Only 213 pages were accompanied by English translations.[6] The 2014 letter and 2015 judgment of acquittal were not translated. Instead of having all 9,677 pages translated in writing, a task that would have taken about 9,677 hours, the defense staffed its trial team with an attorney who is able to read Spanish, Deputy Federal Public Defender Nadadur. Declaration of R. Nadadur, ¶ 2. As part of his work on this case, DFPD Nadadur reviewed all of the Spanish-language discovery. *Id.* at ¶ 3. He focused his attention, however, on the documents pertinent to the trial: Mr. Valiente's arrest, charges, and imprisonment in Guatemala. *Id. See* dkt. no. 1 (Indictment) (charging Mr. Valiente with making a false statement, in 1997, regarding whether he had ever been arrested, charged, or imprisoned for breaking any law or ordinance). Before trial, the defense was not on notice that the government would elicit that Mr. Valiente's case is still pending, that the warrant against him is still active, that Guatemala was unable to locate him in order to extradite him, or that the United States was unaware of the charges against him and thus could not participate in his extradition.  The defense team therefore did not focus its attention on defending against those allegations.

---

[5] Many of these pages were not bates stamped; for instance, what is labeled as bates 31 is in actuality 868 separate .jpg files that are photographs of Spanish-language court records. The defense's best count is that the government produced 9,677 of Spanish-language documents in total.

[6] Even the English translations of these legal documents are difficult to understand. The government, at trial, called as a witness an expert in the Guatemalan legal system to assist in explaining their meaning to the jury.

### 3. The Absence of 404(b) Notice.

The government provided no 404(b) notice that it would argue that Mr. Valiente was a fugitive, in 1990 when he entered the United States, in 1997 through 2000 when he applied for his green card, or at the time of trial. Nor did it give notice of its intent to argue that Mr. Valiente committed actual murders and kidnappings (in contrast to having been arrested, charged, and incarcered on those charges), let alone in a way that implicated human rights concerns or "transitional justice." The defense therefore did not focus on defending against these allegations.

## C. Misconduct at Trial

### 1. The Government Called Mr. Valiente a Fugitive from Justice Without a Good Faith Basis.

Despite the absence of a good faith basis to do so, the government created the false impression that Mr. Valiente was a knowing fugitive from justice, beginning when he entered the United States in 1990 and continuing through his green card application process and trial. Importantly, the government argued that Mr. Valiente's knowledge of the pending Guatemalan prosecution and sentence was his motive for committing the charged crime.

In its opening, the government told the jury, contrary to the evidence and the truth, that when Mr. Valiente entered the United States, he was a "fugitive," a term that necessarily assumes the existence of a pending prosecution of which Mr. Valiente was aware and that he sought to evade.[7] The government also told the jury, falsely, that when Mr. Valiente applied for his green card, he was aware of a pending prosecution in Guatemala and/or that he was aware that his 30-year sentence had been reinstated (it

---

[7] Merriam-Webster's dictionary defines "fugitive" as "1: a person who flees or tries to escape: such as . . . b: a person (such as a suspect, witness, or defendant) involved in a criminal case who tries to elude law enforcement especially by fleeing the jurisdiction → called also *fugitive from justice*." https://www.merriam-webster.com/dictionary/fugitive#:~:text=2%20of%202-,noun,as%20war)%20or%20persecution%20%3A%20refugee

had not), and that he took measures to purposely avoid facing that case and sentence. It argued that this was his motive to lie. The government made the following misrepresentations in its opening:

- "Defendant hid from US authorities that he was a fugitive and that he had fled Guatemala in order to run away from his sentence and to escape justice." Exhibit H (Partial Trial Transcript), p. 136.
- "He covered up that he was a fugitive from justice for serious crimes in Guatemala." *Id.* at 139.
- "You will hear that the defendant knowingly lied about his criminal history because he knew that had he told the truth he would not have been permitted to stay in the US, and, instead, he would have had to face justice and 30 years in prison." *Id.* at 140.
- "The evidence you will hear will show that that card was procured on the basis of defendant's repeated false statements to immigration authorities, that the defendant knew the statements were false at the time he made them and that, because of those false statements, defendant was able to obtain immigration benefits he should not have been entitled to rather than facing justice in Guatemala." *Id.* at 141.

Again, in closing, the government re-emphasized the lie that Mr. Valiente was a fugitive from justice when he entered the United States, and that his knowledge of a 30-year prison sentence awaiting him in Guatemala was the motive for the charged crime:

- "He fled from Guatemala . . ." Exhibit I (Partial Trial Transcript), p. 18.
- "You heard about . . . the amount of time that defendant spent in prison before he fled and came to the US and the lengthy 30-year prison sentence that he was given but conveniently for him has never served." *Id.* at 28.
- "Defendant left Guatemala immediately, and he entered the US just days later in August 1990. And as defendant submitted in his asylum application, he left the country quickly. Ask yourself, why the urgency?

8

Defendant had the motive and intent to leave as quickly as possible and to never go back to the country where he had been convicted." *Id.* at 29.

- "This was a knowing and deliberate cover-up by defendant motivated by wanting to stay in the US and avoid having been returned to Guatemala where he faced that 30-year prison sentence." *Id.* at 30.

In its rebuttal argument, the government continued to argue, without a good faith basis to do so, that Mr. Valiente committed the charged crime because he had both the knowledge of a 30-year sentence awaiting him in Guatemala and the intention to avoid it:

- "Does it make sense that the defendant would just cede [the green card application process] to someone he didn't really know and not have any part in this application process, especially this particular application process? As you heard this is what would allow the defendant to stay in this country. This is important to anybody let alone someone who was facing 30 years in prison if he had to leave the US and return to Guatemala, is it believable to you that the defendant would just bury his head in the sand, not have any in that process and just leave to somebody else?" *Id.* at 58.

- "And I want to talk now about the idea that defense counsel has argued to you that. Mr. Valiente thought he was a free man. Mr. Valiente wanted to put the past behind him. As far as he knew, his conviction had been overturned. He was free and allowed to live freely as an innocent man. As yourself this: If that is true, don't you think the defendant would be telling everybody who could listen, I am a free man? I have been freed. I have been declared innocent. You heard about all the attention, all the notoriety, that this case got because of who defendant was and what he did. If you were in jail for two-and-a-half years and you thought that you had been freed. And you were innocent, as soon as you come to this country, the

9

first thing you is tell the first inspector you see, I have been freed. Here is my proof of my freedom. I am an innocent man. . . So if defendant had thought, sure, I was convicted, but I am a free man. I have been exonerated. On the asylum application and on the lawful permanent resident form, he should have marked yes and explained it. He should have marked yes and attached his proof of innocence. He didn't." *Id.* at 68.

With no pending case against him in 1990 when he entered the United States, it was bad faith for the government to call him a fugitive. With no evidence that he knew of the Supreme Court's 1993 opinion when he applied for his green card, the government had no good faith basis to argue that his motive for lying on his application was to avoid justice.

### 2. The Government Elicited False Evidence that Mr. Valiente was a Wanted Man at the Time of Trial.

The government cultivated the false impression that, at the time of trial, Mr. Valiente was wanted in Guatemala for double kidnapping and murder. It did so by introducing incomplete and misleading evidence and eliciting testimony that the prosecution team knew was false. The trial prosecutor caused its expert witness, Dr. Alexander Aizenstadt, to testify, falsely, 1) that at the time of trial, there was an active, unexecuted warrant for Mr. Valiente's arrest in Guatemala, 2) that at the time of trial, the case against him in Guatemala for double kidnapping and murder was pending, 3) that there was no further appeal after the Guatemalan Supreme Court's 1993 ruling, 4) that before Dr. Aizenstadt took the stand, he had verified whether the Guatamalan Supreme Court's decision was ever revisited; and 5) that the reason Mr. Valiente was not extradited because the United States did not know about his case and Guatemala was unable to locate him. The prosecution team knew and should have known these representations were incorrect.

Over the defense's objection, the government introduced evidence that Mr. Valiente's arrest warrant was reinstated in 2013. Government's Trial Exhibit 4 is a

10

2013 letter from a Guatemalan Court of Appeals to the Director General of the Guatemalan National Civil Police that reads, in part:

> This is to inform you that a judgment was rendered today in the special appeal case 756-90 under the direction of the Second Official reinstating the arrest warrants issued by this court (formerly the Fourth Court of the Court of Appeals) on 16 July 1993, for the crimes of DOUBLE KIDNAPPING, DOUBLE MURDER, ILLEGAL DETENTION, FALSIFICATION OF PLATES AND TRAFFICKING OF EXPLOSIVES, against . . .
>
> 7) CATALINO ESTEBAN VALIENTE ALONZO, usual name CATALINO VALIENTE, 72 years old . . .

Exhibit J at 2875-75.

Also over the defense's objection, the government introduced evidence of a 2014 Interpol order for Mr. Valiente's capture. Government's Trial Exhibit 5 is a 2014 letter from the Court of Appeals to the Chief of Interpol, Guatemala. Exhibit K. The letter recounts the 1987 accusations and proceedings against Mr. Valiente [*check to see whether violent details were redacted in final version*], and continues:

> 5. Upon receipt of the case file in this courtroom, in virtue of resolution made by the Supreme Court of Justice, Criminal Chamber, **orders the immediate capture of the accused. . . CATALINO ESTEBAN VALIENTE ALONSO**. . .
>
> 6. Detention order which has been reiterated in several occasions by this Court because the accused have not been detained.

*Id.* (emphasis in original). It did not introduce any evidence that Mr. Valiente was later acquitted of the charges against him, or that the warrant was recalled.

What the government used these exhibits to argue-- that Guatemala was then actively pursuing viable charges against Mr. Valiente-- it elicited through the false testimony of Dr. Alexander Aizenstadt, its expert on "the Guatemalan legal system as well as the context and procedural history of the defendant's kidnapping and murder

case in Guatemala." *See* Dkt. N. 201, p. 9. During direct examination, the government elicited from Dr. Aizenstadt the following testimony:

> Q. So this certified record [Government Exhibit 4] from the court of appeal states that a warrant was initially issued in 1993 after the Guatemalan supreme court's ruling and then as of the date of this letter, February 20th, 2013, that warrant was being reaffirmed by this newly named court?
>
> A. Yes.
>
> Q. Based on your review of all the records and to your knowledge, was this arrest warrant out of Guatemala ever executed?
>
> A. Not to my knowledge.
>
> Q. The defendant was never arrested on this warrant in Guatemala?
>
> A. Not to my knowledge.
>
> Q. There is still a pending case and a warrant for defendant's arrest as of your review of the records?
>
> A. Yes. According to the records, there is a pending case. Yes.
>
> Q. Then there was no further appeal after the Guatemalan supreme court's ruling, was there?
>
> A. No. No, I have reviewed that, and it wasn't. So the case was remanded to the court of appeals which now has to issue the judgment.
>
> Q. Can the Court of appeals issue a judgment if the defendant has not been arrested on the warrant?
>
> A. They cannot issue a judgment if the defendant is not present because that would violate his right to defend himself. So he has to be present for the court of appeals to issue a judgment. Whether that is the result of an arrest or not -- it is not really determined by the court.

Exhibit A, p. 44-46.

On redirect, the government again elicited false testimony, creating the misimpression that the reason Mr. Valiente had not been extradited to face prosecution

12

in Guatemala is that the United States was unaware of the case, and Guatemala was unable to ascertain his whereabouts. On cross-examination, Dr. Aizenstadt admitted that to his knowledge, "Guatemala never initiated an extradition process to return Mr. Valiente to Guatemala." Ex. A, p. 61. On redirect, the prosecutor elicited the following:

> Q.  Would you agree that in order for extradition proceedings to start, a country would have to know the crimes that somebody committed and where that individual is located?
>
> A. Of course.
>
> Q. Otherwise, you wouldn't know who to ask for extradition or what to expedite for; right?
>
> A. Of course. Extradition has to be requested to a specific country.
>
> Q.  So if the country requesting extradition doesn't know where a person is, they may not request extradition; is that right?
>
> A.  They can't.

*Id.* at 69.

### 3.      The Government Argues that Mr. Valiente Actually Committed Double Kidnapping and Murder.

The government went beyond showing merely that Mr. Valiente had been "arrested, charged, or imprisoned"[8] in Guatemala, an element of the offense it was required to prove. It argued to the jury that he *actually committed* the kidnappings and murders. The government argued, in closing:

> And these weren't little white lies about things that didn't matter. These were false statements literally about life and death, about kidnapping and murder, about *what defendant had done in his past* that would have precluded him from becoming a lawful permanent resident in the United States. Ex. I, p. 16. (emphasis added).

---

[8] Dkt. No. 1 (Indictment).

And later, the government doubled down: "And it was a false statement to hide double murder by a police officer about as serious a crime as there is." *Id.* at 30.

### 4. The Government Linked Mr. Valiente to the Internationally-Recognized Human Rights Abuses of an Autocratic Regime.

The government framed Mr. Valiente's kidnappings and murders as human rights abuses, committed in furtherance of an autocratic military regime in which Mr. Valiente wielded great power.

#### a. The Gratuitous Nazi Reference.

The theme of international human rights abuses began in jury selection, when with no legitimate purpose, the government gratuitously informed the jury that many Nazis committed the same crime Mr. Valiente was charged with. Prospective juror number nine, a Holocaust historian, had already communicated an ability to serve as a juror on the case, affirming to the Court that because she takes issue with the fairness of immigration laws, she had a "bias built in." Ex. H, p. 63.

The government, with no legitimate rehabilitative aim, used its questioning of the juror to raise the specter of Nazis who committed the same crime with which Mr. Valiente was charged. In its voir dire, the government addressed juror nine first.  It asked her to "explain generally how [her] job and [her] training have led [her] to have some opinions about immigration reform." *Id.* at 89. The juror explained that because she has studied the ways that our immigration laws prevented Jews from emigrating here during the Holocaust, that immigration reform is central to the her work. *Id.*at 89-90. The government continued:

> MR. MAUSNER:  In your view, based on your study of the Holocaust, you believe that more of the potential victims or soon to be victims should have been allowed to immigrate to the United States so that our immigration laws should be a little bit more loose with respect to potential victims?
>
> THE PROSPECTIVE JUROR: Yes. And that the refugee laws that were put in place both internationally and nationally in the wake of the Holocaust should be

used to save refugees in this country rather than prevent them from accessing those opportunities.

MR. MAUSNER: In your studies of the Holocaust and post Holocaust era, are you also familiar with some of the Nazi war criminals and the perpetrators of the Holocaust who were allowed to immigrate here?

[THE JUROR][9]: Very few were allowed to immigrate here. Many more immigrated to Argentina, to Uruguay and other countries in Latin America.

MR. MAUSNER: And were they permitted to immigrate there despite being perpetrators of some very serious crimes?

THE PROSPECTIVE JUROR: Some of them. Some of them were recruited by our government to come and help       implement new forms of government, new kinds of science. They were willing to kind of overlook certain kinds of things legally. Some of them lied and were able to find their way here. But, to my understanding, none of them ever committed any crimes in the United States once they got here.

MR. MAUSNER: There were some who were able to come to this country and were able do so by lying on their immigration paperwork. Is that --

MR. MAUSNER: Many Jews were able to get here and save their lives by lying on their immigration papers as well.

MR. MAUSNER: Understood. Thank you for that. I appreciate that. I would like to turn now to juror No. 37.

MS. O'CONNOR: And, Your Honor, I am going to reserve a motion for the Court at the earliest opportunity. Thanks.

*Id.* at 90-91.

---

[9] During this exchange, the transcript at times mistakenly identifies Mr. Mausner as the speaker when he is not. This correction appears in brackets.

Tellingly, the government's questioning of this juror was not an attempt to rehabilitate her or undermine the basis for the unequivocal bias she had already expressed. There was no legitimate need to further illustrate the grounds for her clear inability to serve as a juror. The government did not object when the Court proposed that she be excused for cause. *Id.* at 113-14. This line of questioning was designed to and effectively did poison the jury pool.[10] [11]

### b.     Human Rights, "Transitional Justice," and Mr. Valiente's Position of Power in an Autocracy.

Through testimony and argument, the government improperly linked Mr. Valiente's case with the international struggle for human rights. On direct of Dr. Aizenstadt, it elicited testimony that his prosecution was an instance of "transitional justice, which is justice after autocratic regimes or military regimes," that Mr. Valiente enjoyed a high position in that autocratic regime, and that the international human rights community had issued a judgment on his prosecution.

> Q.     And you mentioned the defendant was the chief of police at the time that he was arrested and charged?
>
> A.     He was the chief of police for the state of Quetzaltenango. Yes.
>
> Q.     And do you know of any positions he had in the police force prior to that time?

---

[10] The government knew that its questioning would have this effect. It had filed a motion in limine that, in part, sought to preclude the defense from raising at trial "political debate and arguments regarding United States immigration policy . . ." Dkt. No. 68. In its motion, the government recognized: "These political and policy issues are not relevant to any element or defense in this case, would be geared only toward sympathy and nullification, and should therefore be excluded." *Id.* at p. 5. The defense did not oppose the motion.

[11] The defense had requested jury questionnaires in order to avoid poisoning the jury pool during voir dire with inquiries such as this. The government opposed that request.

A.      Some human rights publications have mentioned that he was the deputy chief for the first body of national police in Guatemala City, at least in 1979, which would be four or five levels below the president."

Q.      Of Guatemala?

A.      Of the country. And so three levels before the ministry of the interior, who would be superior for the chief of national police at the time.

Ex. A, p. 24-25. Later in Dr. Aizenstadt's direct, the government reiterated the theme:

Q. At the time and in the context here was the prosecution in Guatemala of the defendant for double kidnapping and murder particularly noteworthy?

A. It was. Yes. Particularly in that region of the country.

Q. And why is that?

A. I have spent the majority of my legal career and education studying *transitional justice, which is justice after autocratic regimes or military regimes.* And in my experience reviewing those cases, this is probably among the first that I have seen in Guatemala where a high official of police is charged or even convicted of crimes in Guatemala. So that is particularly relevant in the region.

Q. Was this a well-known case particularly in that region of Guatemala?

A. It was published in the newspapers, and there were -- it was also -- it was published in the newspapers in Guatemala, and *it was also taken by international human rights organizations that issued judgments on that.*

MS. O'CONNOR: I am going to object to this, Your Honor, and add it to my motion I reserve.

*Id.* at 48-49 (emphasis added). In closing, the government emphasized Mr. Valiente's position of authority. Its closing began:

The defendant was not an ordinary migrant to this country. The defendant was the chief of police. Before that, he was deputy chief of police in Guatemala City, a position that you heard was about fourth or fifth from the president of Guatemala. . . Throughout his life, he was educated and trained as a police

17

officer and throughout his life he was powerful. He was used to being in charge, and he was used to giving out orders. He was the boss. In the words of the Guatemalan court, he was the mastermind and the intellectual author [of the double kidnapping and murder].

Ex. I, p. 54.

> ### 5. Improper Comments on Mr. Valiente's Exercise of Constitutionally-Guaranteed Rights and Mr. Valiente's Behavior at Trial.

The government argued to the jury that Mr. Valiente's presentation of a defense and his use of Spanish interpreters-- two rights guaranteed to him by the Constitution-- were efforts to manipulate the system and trick the jurors. It adopted as its refrain that Mr. Valiente's presentation of a defense was a "sleight of hand," "smoke and mirrors," and a "distraction." In its closing, the government made the following statements:

- "Defendant's attempt to insert what they are calling notario fraud into this case is smoke and mirrors. It is a sleight-of-hand deception intended to confuse you . . . But none of that matters."  Ex. I, p. 31.
- "Do not let defendant's attorney's attempts at misdirection get in the way of what is a simple case about defendant covering up his criminal past in order to become a permanent resident." *Id.*

Continuing into its rebuttal argument, the government argued the following:

- "These phantom notarios are just convenient scapegoats and made-up stories for the purposes of this trial." *Id* at 55.
- "Now, I want to talk a little bit about some of the specific arguments that the defense made, but, again, as I have said in my initial statement, a lot of it is just distraction." *Id.* at 56-57.
- "Mario Castillo is not the shady puppet master, not part of this convenient story that defense attorneys have concocted for this trial." *Id.* at 59-60.

18

- "Sleight of hand, distractions, meant to confuse you from the issues." *Id.* at 61.

- "Another sleight of hand. You heard the defense attorney talk about the visa that defendant used to enter the country in 1990, and she told you that this was a valid visa. This visa was good for defendant to come in indefinitely whenever he wanted to. You heard from Special Agent Hermosillo that is not how those visas work. Those visas are valid for a maximum of six months. It is not permission for defendant to be in the country indefinitely. Sleight of hand, distraction, confusing but really doesn't matter." *Id.* at 61.

- "Defense counsel pointed you to some portions of the forms that involve what appear to be mistakes on the forms. And some of the mistakes that defense counsel has pointed out are in what way did defendant come into this country. Was it legally or illegally, and she pointed to a portion of the asylum application where illegally was written in? And according to the defense to attorney, that must have been a mistake that a notario made because he came in legally because he had a valid visa. That is not true. He came in illegally. So is that actually a mistake on the form? No. *But again, sleight of hand, distractions. Doesn't matter.*" *Id.* at 62.

All in all, government counsel referred to Mr. Valiente's defense as a "sleight of hand" six times, "smoke and mirrors" four times, a "distraction" four times, an attempt to confuse the jury four times.

   Not only did the government repeatedly malign defense counsel's integrity throughout its closing but it suggested a collusion between counsel and Mr. Valiente to deceive the jurors and game the judicial system. Regarding Mr. Valiente's use of interpreters during trial, the government said the following:

- "I would like to address now some comments and argument that Ms. O'Connor made about language, about Spanish versus English, and you

19

have seen now that the defense has made this case about whether the defendant speaks English. *That has now been injected as an issue in the case, and look, that appears to have always been their plan for the defense in this case. Defendant doesn't speak English. And if that is going to be your defense, then of course you'll bring an army of interpreters to your trial.*" *Id.* at 62 (emphasis added).

- "*Anyone can put on a show and make it seem like they don't speak any English at all*, but that is not the question in this case." *Id.* (emphasis added).

### III. ARGUMENT

Federal Rule of Criminal Procedure 33 empowers a trial court to vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. Proc. 33(a). *See, e.g., United States v. Butler*, 567 F.2d 885 (9th Cir. 1978) (reversing conviction and holding that Rule 33 new trial motion should have been granted where government violated *Napue*).

### 1.      The *Napue* Violation, Standing Alone, Requires a New Trial.

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State," violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. *Id.*

A claim under *Napue* will succeed when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material. *Jackson*, 513 F.3d at 1071–1072 (citing *Hayes* v. *Brown* 399 F.3d 972, 984 (9th Cir. 2005) (en banc)).

### a.      The Government Elicited False Evidence.

The first element of a *Napue* violation is satisfied here. As outlined above, the government elicited from Dr. Aizenstadt the following false testimony:

20

- That at the time of Dr. Aizenstadt's testimony, there was still a pending case against Mr. Valiente in Guatemala;

- That at that time, there was still an active warrant for his arrest;

- Then there was no further appeal after the Guatemalan Supreme Court's 1993 ruling;

- That before he took the stand, Dr. Aizenstadt verified whether the Guatemalan Supreme Court's decision was ever revisited;

- That Mr. Valiente was not extradited because the United States did not know about his case and Guatemala was unable to locate him.

### b.    The Prosecution Team Knew and Should Have Known the Evidence was False.

For *Napue* purposes, the knowledge of any member of the prosecution team is imputed to the entire prosecution team. This is true even if the trial prosecutor who elicited the false testimony had no actual knowledge of its falsity. As the Ninth Circuit has explained:

> In *Giglio*, both *Napue*  and *Brady* errors were at issue. A federal prosecutor offered immunity to a key witness in return for grand jury trial testimony. After the witness testified before the grand jury, but before trial, the case was transferred to another prosecutor who was not aware of the immunity agreement. The witness testified for the government at trial, stating that he had not received any promises that he would not be indicted. Writing for the Court, Chief Justice Burger found reversible error under *Napue* and *Brady*: "[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the government."

*Jackson*, 513 F.3d at 1073 (internal citations omitted) (finding *Napue* violation where trial prosecutor lacked personal knowledge of falsity of statement). *See also Boyd v.*

1  *French*, 147 F.3d 319, 329 (4th Cir. 1998) (imputing law enforcement's knowledge of

2  falsity to the prosecution).

3  The defense has no information to believe that the trial prosecutor had personal

4  knowledge, at the time of trial, that he was eliciting false testimony, and we do not

5  argue that here. Assistant United States Mausner was not assigned to this case in 2018,

6  when his Office issued its press release recognizing that the arrest warrant had been

7  recalled and the status of Mr. Valiente's Guatemalan prosecution was in doubt. *See* Ex.

8  D.  Despite the fact that it was publicly-available on the internet-- on his Office's

9  website, at that-- and authored by his colleagues about a case he subsequently took

10  over, there is no evidence that he actually saw the press release before the defense

11  brought it to his attention after trial.[12] It would be in bad faith to argue that AUSA

12  Mausner read and understood the press release without actual evidence that he did, and

13  we do not do that here.

14  Nor does the defense argue or have reason to believe that AUSA Mausner

15  actually does read Spanish, or that he reviewed the 2015 Spanish-language appellate

16  court opinion in his possession with enough care to realize that it was, in fact, a 2015

17  appellate court opinion about Mr. Valiente's case that warranted further scrutiny. It

18  would be bad faith to argue that his representation that he does not read enough Spanish

19  to understand the discovery in his possession is a "show," or "smoke and mirrors," or

20  that he must have enough Spanish proficiency to realize the gist of what the document

21  said. Nor do we argue that because he was in a position of authority, he must have

22  informed himself of the contents of the discovery. We give him the benefit of the doubt

23  and accept that he did not have actual knowledge that the testimony he elicited was

24  false.

25

26

27

28  [12] The press release caught the defense's attention only after trial, when defense
counsel performed a google search of Mr. Valiente's name.

22

Regardless of the trial prosecutor's individual knowledge, though, that the false testimony "was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." *Napue*, 360 U.S. at 270. *See also United States v. Butler*, 567 F.2d 885, 889 (9th Cir. 1978) (holding that "even if" the prosecutor's actions were "negligent or unintentional instead of willful" a new trial was required); *Jackson*, 513 F.3d at 1073.

This element of *Napue* is satisfied because members of the prosecution team knew, and the trial prosecutor himself should have known, of information rendering the elicited testimony false. Since at least 2016, the prosecution team had documents in its possession that demonstrated the falsity of Dr. Aizenstadt's testimony. The members of the prosecution team who contributed to the press release were aware of facts that made his testimony false. And further, taking the trial prosecutor's word that he did not have actual knowledge of the testimony's falsity, he certainly *should have known*. Once he made the decision to make an issue of the current status of Mr. Valiente's Guatemalan case (over the defense's objection), he should have done his due diligence before eliciting testimony from Dr. Aizenstadt that the prosecutor did not verify by reviewing documents he had in his possession. And the prosecutor should not have induced Dr. Aizenstadt to testify, falsely, that Dr. Aizenstadt had reviewed the post-1993 procedural history of the case and confirmed and that there were had been no further proceedings. Dr. Aizenstadt clearly had not conducted the review he testified that he conducted. If he had, he would have known that in 2015, an appellate court acquitted Mr. Valiente of all charges against him, finding that his original convictions had been secured by impermissible burden shifting and improperly-applied presumptions of guilt, and that the evidence was insufficient to sustain the convictions. *See* Exs. E, F.

### c.   *Napue*'s Low Materiality Threshold is Satisfied.

A *Napue* violation requires that the conviction be set aside whenever there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Jackson*, 513 F.3d at 1076 (emphasis in original) (internal citation omitted)

(contrasting *Brady*'s more stringent materiality analysis[13] which requires a "reasonable probability" that the result "would have been" different). Although *Napue* does not create a *per se* rule of reversal, the Ninth Circuit has "gone so far as to say that if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Jackson*, 513 F.3d at 1076 (quoting *Hayes*, 399 F.3d at 985). *See also Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) (*Napue* materiality is "less demanding," and "requires [the court] to determine only whether the error *could* have affected the judgment of the jury"); *Butler*, 567 F.3d at 890 (where *Napue* violations are negligent instead of willful, a new trial is required even without a finding that the jury would have changed its verdict); *United States v. Gale*, 314 F.3d 1, 3 (D.C. Cir. 2003) (describing the knowing use of false testimony as a "veritable hair trigger for setting aside the conviction").

The violation here goes to the heart of this case, coloring Mr. Valiente's credibility and his character in the eyes of the jury. His alleged fugitive status was, the government argued, both his motive to commit the charged crime and to deceive the jury at trial: to invent a "smoke and mirrors" story about a notario and to "put on a show" by using an interpreter. To be a fugitive is to have a disregard for the law and to

---

[13] The form of the discovery disclosure here—court documents in a foreign language's obtuse legalese that necessitated an expert witness' interpretation at trial—does not satisfy *Brady v. Maryland*, 373 U.S. 83 (1963). Various courts have held that the government does not satisfy *Brady* when it produces an exculpatory needle in a haystack of discovery materials. *See United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y 2013); *United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part and vacated on other grounds*, 561 U.S. 358 (2010) (suggesting that *Brady* violations related to voluminous open file discovery depend on what the government does in addition to providing access to discovery); *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998) ("The Government cannot meet its *Brady* obligations by providing . . . 600,000 documents and then claiming that [the defendant] should have been able to find exculpatory information[.]"). However, because a prosecutor is never absolved of his duty to refrain from eliciting false testimony, we analyze this violation under *Napue*. *See Jackson*, 315 F.3d at 1071 (analyzing error under *Napue* materiality standard before reaching *Brady* analysis).

24

live a lie. Every moment is a deception and an evasion. The false testimony here meant that the jury understood the defendant before it to be thumbing his nose at justice, as he had successfully been doing for more than thirty years, evading a pending, just, and righteous deportation and prosecution for horrendous crimes. Courts routinely reverse convictions where *Napue* violations touch upon a *witness'* credibility. *See, e.g., Hayes*, 399 F.3d at 988; *Jackson*, 513 F.3d 1057; *Sivak v. Hardison*, 658 F.3d 898 (9th Cir. 2011) (reversing as to penalty phase); *Butler*, 567 F.2d 885. Here, the violation assails the *defendant*'s credibility-- a harm more devastating than any skewing of a witness' veracity. *See, e.g. Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) (granting habeas relief where *Napue* violation falsely implied that defendant had taken steps to prevent his identification in a line-up).

### 2.    The Cumulative Effect of the Government's Misconduct Warrants a New Trial.

Mr. Valiente should receive a  new trial based on the *Napue* violation alone. However, considered cumulatively, the case for a new trial here is even stronger. The government misconduct here "so infected the trial with unfairness" as to make Mr. Valiente's conviction a denial of due process. *Darden v. Wainwright*, 477 U.S. 168, 182-83 (1986) (finding no due process violation because prosecutor's argument "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent"). *See Jackson*, 315 F.3d at 1071 (analyzing whether *Napue* violation alone warranted reversal before assessing effect of cumulative misconduct). The government's improprieties in this case are exactly the kind that the Supreme Court warned of in *Darden*: they were manipulations and misstatements of the evidence, and they implicated Mr. Valiente's specific rights.

### a.    Unnoticed 404(b)

Where a prosecutor seeks to introduce evidence of another crime, wrong, or act for a permissible purpose, such as to prove motive, intent, or plan, the prosecutor must:

(A) provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it;

(B) articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and

(C) do so in writing before trial-- or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b).

"Reasonable notice is designed to reduce surprise and promote early resolution of admissibility issues." *United States v. Vega*, 188 F.3d 1150, 1153 (9th Cir. 1999) (internal citations omitted). In *Vega*, the Ninth Circuit granted the defendant a new trial, explaining:

The government's failure to give Vega notice of the 404(b) evidence prejudiced Vega in that her trial strategy could not adequately address other acts evidence since she did not know it would be introduced. Vega was not able to investigate the other acts evidence that the government intended to use, nor could she prepare for cross examination of the rebuttal witnesses. Instead of giving Vega notice, as required by Rule 404(b), the government lay in wait and sprung the "other acts" evidence on her . . .

*Id.* at 1155.

That is exactly what happened here. The government accused Mr. Valiente, at trial, of two other broad sets of "other bad acts": first, that Mr. Valiente was a "fugitive," and second, that he was a murderer and kidnapper (and not just somebody who was arrested for, charged with, and imprisoned for those crimes). The prosecutor argued that each of these "other bad acts" was Mr. Valiente's "motive" for lying on his green card application. *See, e.g.,* Ex. I at 30 ("And it was a false statement to hide double murder by a police officer about as serious a crime as there is"); Ex. H at 40 ("You will hear that the defendant knowingly lied about his criminal history because he knew that had he told the truth he would not have been permitted to stay in the US, and,

26

1  instead, he would have had to face justice and 30 years in prison"). Because there was

2  no 404(b) notice, the defense was unprepared to address this inflammatory evidence.

3  **b.      Maligning the defense and defendant**

4  The government's other comments—accusing defense counsel and Mr. Valiente

5  of deception, including that Mr. Valiente's use of an interpreter was a sinister trick to

6  evade responsibility for his crime—were also misconduct, and contributed to the

7  unfairness of his trial.

8  It is improper for a prosecutor to accuse defense counsel of dishonesty. *United*

9  *States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005) (citing *Cline v. United* States, 395

10  F.2d 138, 141 (8th Cir. 1968)). Such statements are improper because a prosecutor's

11  comment "carries with it the imprimatur of the Government and may induce the jury to

12  trust the Government's judgment rather than its own view of the evidence." *Id.* (citing

13  *United States v. Young*, 470 U.S. 1, 18-19 (1985)). They are also improper because:

14  The United States Attorney is the representative not of an ordinary party to a

15  controversy, but of a sovereignty whose obligation to govern impartially is as

16  compelling as its obligation to govern at all; and whose interest, therefore, in a

17  criminal prosecution is not that it shall win a case, but that justice shall be done.

18  *Berger v. United States*, 295 U.S. 78, 88 (1935) (condemning prosecutor's suggestion

19  that defense counsel "can just sit up in their offices and devise ways" to defend against

20  counterfeit currency charges but have the advantage of being able to accuse the

21  prosecutor of unfairness).

22  The prosecutor's comments here bear a striking resemblance to comments that

23  courts routinely condemn as improper. In *Holmes*, for example, the government said

24  the following in its rebuttal: "Mr. Moss is a good defense attorney, tries to get you to

25  focus your attention over here when what really is important is right in front of you. It's

26  all smoke and mirrors." *Holmes*, 413 F.3d at 775. It continued: "Mr. Moss wants to

27  distract you and tell you about this other evidence that's not important." *Id.* It argued

28  that the trial defense, which raised issues about who owned the gun in question, was a

"red herring." *Id.* The government went further, suggesting that defense counsel and the defendant had colluded to deceive the jury: "'Mr. Moss needs to make sure that they get their stories straight' ('they' presumably reffered to Mr. Moss and Mr. Holmes)." *Id.* The Eight Circuit reasoned:

> We think that these various comments referring personally to [defense counsel] and the necessity for [defense counsel] to "get his stories straight," taken as a whole and in the context of the rebuttal argument, show that the government attorney was accusing defense counsel of conspiring with the defendant to fabricate testimony. These types of statements are highly improper because they improperly encourage the jury to focus on the conduct and role of Mr. Holmes's attorney rather than on the evidence of Mr. Holmes's guilt. Such personal, unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal or civil case.

*Id. Accord United States v. Friedman*, 909 F.2d 705, 709-10 (2d Cir. 1990) (reversing conviction due to argument stating defense counsel would "make any argument he can to get that guy off"; prosecutor was not entitled to "malign defense counsel by accusing him of willingness to make unfounded arguments"); *United States v. Rodriguez-Lopez*, 756 F.3d 422, 434 (5th Cir. 2014) (disparaging defense counsel's motives for representing criminal defendant was improper); *United States v. Jones*, 839 F.2d 1041, 1049 (5th Cir. 1998) (prosecutor's argument that defense counsel was submitting "distorted defense" and thereby "sponsor[ing] perjury" was "reprehensible"); *United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989) (overturning conviction because prosecutor improperly accused defense counsel of hiding expert witness to prevent government's use of witness); *Bates v. Bell*, 402 F.3d 635, 647 (6th Cir. 2005) (deeming prosecutor's response of "[i]t's getting too close to you" and other responses to defense counsel's objections an improper assailment of a defendant's right to object); *United States v. Rodrigues*, 1998 U.S. App. LEXIS 36919 at *31 (9th Cir. 1999) (declaring a prosecutor's statement that defense counsel had "tried to deceive [the jury]

28

from the start" improper, having "arguably crippled the defense," and reversing in part); *United States v. Richardson*, 161 F.3d 728, 735 (D.C. Cir. 1998) (reversing conviction where prosecutor suggested that defense counsel was "out of touch with the realities and concerns" of the jurors' world); *United States v. McLain*, 823 F.2d 1457, 1462-63 (11th Cir. 1987) (reversing conviction under plain error standard in part because prosecutor repeatedly stated that defense counsel "intentionally misle[d] the jurors and witnesses and . . . [lied] in court.").

Further, a prosecutor's comment on a non-testifying defendant's behavior or demeanor during trial is improper. *See United States v. Schuler*, 813 F.2d 978, 980-81 (9th Cir. 1987) (holding that prosecutor's comment on defendant's laughter during trial was impermissible character evidence, violated Due Process right not be convicted except on the basis of evidence adduced at trial, and may have impinged on Fifth Amendment right not to testify); *United States v. Carroll*, 678 F.2d 1208 (4th Cir. 1982); *United States v. Gatto*, 995 F.3d 449, 455 (3d Cir. 1993).

Here, the prosecutor commented on Mr. Valiente's behavior at trial in when he called the jury's attention to the "army of interpreters" that the defense had allegedly brought to trial as an effort to deceive the jury. Ex. I, p. 62. "Anyone can put on a show and make it seem like they don't speak any English at all . . ." *Id.* It accused defense counsel of dishonesty, and Mr. Valiente of conspiring with defense counsel to trick the jury, throughout its closing remarks. Ex. I.

These comments are not only improper, but they also implicated Mr. Valiente's constitutional rights under the Fifth and Sixth Amendments: his ability to present a defense, his right to be presumed innocent, his right to understand and participate in the proceedings against him, and his right to due process. When specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). *E.g., Schuler*, 813 F.2d 978; *Carroll*, 678 F.2d at 1209-10 (comments on defendant's behavior while viewing evidence at trial violated

Fifth and Sixth Amendments); *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) (comments referencing defendant's leg "going up and down" and nervous behavior at trial violated due process).

## IV.  CONCLUSION

This trial was tainted by pervasive governmental improprieties that stripped Mr. Valiente of his ability to adequately defend himself. This Court, in the interest of justice and fairness, should grant him a new one.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  April 28, 2023          By   */s/ Christy O'Connor*

CHRISTY O'CONNOR
RAMANUJAN NADADUR
Deputy Federal Public Defenders
Attorneys for CATALINO VALIENTE
ALONZO